Mr. Justice McLean delivered the opinion of the Court. A writ of error to the Supreme Court of Arkansas brings this case in chancery before us under the 25th section of the Judiciary Act. .On the 25th December, 1824, Matthew Cunningham, by his at* torney, applied to the Register of the land office at Batesville,in Arkansas, to become the purchaser of the south-east quarter of section three, in township one north, and in range twelve, west of the fifth principal meridian, south of the Arkansas river; by virtue of a certificate, No. 23, granted, by the Register of the said land district, to William Wylee, assignee of William Morrison, under the act of 26th May, 1824. That act provided that every person entitled to the right of preemption by law, in the tract of country north of the Arkansas river, which was ceded to the Cherokees, should be authorized in lieu thereof to enter, with the above Register, any tract in the Lawrenceville District, on which he may have made improvements previously to the passage of the act; or on any unimproved tract within the district, the sale of which is authorized by law. By several mesne assignments, the right of the Cherokee certificate was vested in Cunningham, and the land he proposed to enter was, by law, authorized to be sold. The agent of the complainant informed the Register and Receiver that he had the money, and was desirous of paying for the land; but after consultation between the officers, he was informed that the entry would not be permitted. The ground of this rejection was not stated, at the time, nor entered upon the records of either office. There can be no doubts, from the facts in the case, which appear in the correspondence of the general land office and otherwise, that the application to make the entry was rejected on the ground that the land was covered by New Madrid locations. And it appears that the New Madrid locations had been laid on the quarter section, one on the 19th April, 1820, and the other on the 1st May of the same year. On the 27th May, 1831, the complainant claimed the right of pre-emption to the same quarter section, under the act of 29th May, 1830. Being duly sworn, he stated “that, in the year 1829, he had in cultivation about four acres in corn and vegetables on the land, and had been in possession of it near ten years, was in possession of it the 29th May, 1830, and still occupied it.” Several other witnesses proved the same facts, and one of them states that he saw the complainant put down on the counter about $200, and informed the Receiver that it was offered in payment of the land. In the record, there is a list of the pre-emptions allowed at the land’office at Batesville, by II. Boswell and R. Redman, late register and receiver, from the 8th January, 1831, to the 30th June, in the same year, as appears from the papers of that office. In that list, the name of Matthew Cunningham stands first, as having entered the south-east quarter of section three, first township north, twelfth range west. It is certified by Townsend Dickinson, register. On this paper, the word “rejected,” is found; but by whom written, or for what purpose, does not appear on the paper. The names of II. Boswell and J. Redman are under the word “rejected,” and several of the witnesses state that the word “rejected” or “allowed,” was endorsed on the envelope of preemption papers as the decision of the land officers was made. In the list, is the name of Nathan Cloves, claiming the preemption right to the north-west fractional quarter of section two, in township one, north of range twelve, the claim to which was decreed to his heirs, in Lytle et al. vs. The State of Arkansas et al., 9 Howard 328. There is also in the record a certificate of Samuel M, Rutherford, Register of the land office at Little Rock, where the papers of the Batesville officers are deposited, dated the 27th December, 1837, which states “that Matthew Cunningham was allowed, at the land office at Batesville (Lawrenceville District,) a preemption claim on the south-east quarter of section three, township one, north of range twelve west, as appears from the papers furnished this office from the land office at Batesville, as having-been allowed said Cunningham prior to the 30th June, of the same year.” The year referred to, was 1831, as stated in the above list of pre-emption claims. Various efforts were made by the complainant, at the land office at Batesville, and at the general land office at Washington, to procure a full recognition of his pre-emption claim. Appeals on the subject were made to the Secretary of the Treasury and to the Attorney General, all of which resulted in the denial of his claim, on the ground that the quarter-section was not subject to a pre-emptive right, by reason of the prior New Madrid locations. It appears, from the record, that, at the land office at Little Rock, on the 6th June, 1838, there was entered by Samuel Plum-mer, by virtue of his pre-emption float, under the act of 1830,' and the supplemental act of 1832, the east-half of the south-east quarter of fractional section three, south of the Arkansas river, in township one, north of range twelve west, containing eighty acres, &c., as per certificate granted to him, No. 3,549.” And that, on the same day, Mary L. Imbeau entered, by virtue of her pre-emption float, under the act of 1834, and circular of the general land office, of the 9th June, 1837, the west-half of the southeast quarter of section three, in township one, north of range twelve west, &c., as per certificate granted to her, No. 3,554. In their answers, the defendants say, “that they caused application to be made by legal and valid floating pre-emption rights fully authorized by law to locate and enter said south-east quarter of section three, the same being then vacant public land, and liable by law to be entered by such floating rights ; and this defendant (Ashley), in conjunction with said Beebe, caused the samé to be entered, on the east-half, in the name of Samuel Plummer, and the west-half in the name ot Mary L. Imbeau,” &c. “Which said floating pre-emption rights were located, entered and transferred according to law, and all the lawful rules and regulations of the general land office ; and were duly patented to said Beebe, by the President of the United States, on the 25th September,-1839.” On the 26th December, 1838, the commissioner of the general' land office required the land officers at Little Rock to inform hitn “why entries 3,549 and 3,554, with two others, were permitted to be made on land already occupied by prior claims long since located, and against the validity of which this office possesses no evidence.” In reply, dated 30th January, 1839, the land officers stated that the entries were permitted, “upon the demand of Roswell Beebe, and the several allegations made- by him, setting forth and showing conclusively that the Treasury Department had disallowed the pre-emption claims under the act of 1814, upon all the lands south of the Arkansas river, ceded by the Q,ua-paw treaties of 1818 and 1824,” &c. And they say, “the original plat of survey embracing those entries, were complete, and represented the subdivisional lines, and the number of acres corresponding respectively with those certificates of entry, and there was no evidence of record on file in either of our offices, to show that these lands were ever regularly entered or located, and due return made thereof according to law, except such evidence as was exhibited by the pre-emption abstract from Batesville under the act of 1814, and the coloring of the plat. The capitol of the State of Arkansas is' built upon a portion of these lands at a cost of some $70,000 or more. The corporate authorities of the city of Little Rock, as well as the inhabitants, all hold under conveyances derived from, as under the pre-emption claim, and against the New Madrid claims, either by a compromise made by the respective claimants about the year 1821, or by the decision of the land officers at Batesville, of which we are not particularly informed. All parties within the limits of the city, we believe, are fully satisfied that these entries, which embrace it, will cure the defects in their titles, as no dissatisfaction is believed to exist with any one interested in the question. These entries were therefore allowed by us on due reflection, under the belief that we were acting correctly in the faithful discharge of our duties; and by which the individuals who supposed they rightfully claimed those lands will be enabled to obtain a perfect title, and thereby save and protect the rights and titles of the numerous persons claiming under them, and to whom they are bound by obligation or deed.” In a letter from the commissioner of the general land office, dated the 24th September, 1839, to the Register and Receiver at Little Rock, he says, your letter in reference to certain tracts of land located by floats 3,549 and 3,554, under the act of the 19th June, 1834, has been received; and he remarks, after an attentive and careful examination of all the questions connected with the different claims preferred to the land above referred to, this office, on the 18th inst., transmitted to the Secretary of the Treasury, agreeably to his request, all thepapers in reference to the case, with an opinion of this office in favor of a confirmation of these floats, regarding the bond filed by Roswell Beebe as a sufficient compliance with the spirit of the circular of the 11th October, 1837; and I have this day received from him a communication concurring in that opinion. Patents will therefore issue for certificates 3,549 and 3,554, and two other numbers stated. The circular referred to by the commissioner, in the above letter of the 11th October, 1837, contains the following sentences : “ The President of the United States has directed that, until further action of Congress thereon, the rights of pre-emption of 80 acres of land elsewhere, usually called floating fights, granted by the second section of the act of Congress, approved May 29th, 1830, which act was revived and continued by the act approved June 19th, 1834, and which, also, as you were informed by my circular of June 19th, 1837, is, for certain purposes therein stated, still in force, shall be restricted in their location to unimproved and vacant land.” “You are, therefore, instructed not to permit the entry, by virtue of a floating right, of any tract on which there is a cultivation, improvement, settlement, or occupant, unless the owner of the float shall first produce to you the written consent thereto of the person or persons claiming the same improvement, cultivation, settlement, or occupancy, attested by two witnesses.” The second section of the act of the 29th May, 1830, provides that where two persons are settled on the same quarter section, each may receive a pre-emption for 80 acres, and a right to enter 80 acres elsewhere, so as not to interfere with other settlers having a right of preference. In his letter to the Secretary of the Treasury, “ in favor of a confirmation of the above floats,” the commissioner says, “the .claim of Matthew Cunningham, under the act of 26th May, 1824, has heretofore been disposed of;” and further, “that the claims of Christian Brumback and Matthew Cunningham, under the preemption act of 29th May, 1830, have no validity. The report of the Register and Receiver, dated 20th July, 1839, and its accompanying papers, together with the Receiver’s letter of the 25th July, 1839, with the inclosure, show that no action had been had on the claim of Christian Brumback by the land officers ; that no tender of the purchase money was made by him, and no explanation can be given why his claim had been allowed to sleep from 1831 to 1839; and then only revived upon the rejection of the claim of Mrs. Backus for the same quarter section under the act of 1838, who claims also to hold under Brumback’s claim of the act of 1830. Brumback’s own testimony shows, also, that he was living there by the permission of one of the proprietors of the town, and made the improvement for their benefit under a contract, and his deed of December 22d, 1824, accompanies those papers, whereby those improvements were conveyed to Chester Ashley, one of the proprietors.” And further, in relation to Cunningham’s claim under the act of 1824, he says it was rejected under the opinion of the Attorney General, and remarks, “ there is a strong point against the validity of that claim, which circumstances did not render it necessary heretofore to make, viz : that as the law of 26th of May, 1824, granted the privilege of entering vacant land only, except where the pre-emptor or his legal representative was desirous of securing his own improvements made prior to the passage of the law, &c., and he argues that Cunningham should not be permitted to locate 160 acres of land, to secure improvements on a few town lots.” On the 15th July, 1839, it appears, by the certificate of the Receiver at Little Rock, that the complainant again tendered the sum of $200 in payment of the quarter section in controversy. As the legal title to the land in controversy is in the defendants, the right of the complainant can be sustained only by showing a paramount equity. This he has attempted to do. But, before we enter upon this investigation, it may be proper to state distinctly the grounds on which the title of the respective parties will be considered. From the issue made by the pleadings, we do not consider the New Madrid locations, or any right under them, as involved in the case. They were necessarily set aside, if not abandoned, by the defendants, when they located their floating rights on the lands in controversy, on which patents were obtained. • The right of the complainant has, from its origin, been hostile to the New Madrid claims. The equity of complainant must rest upon his occupancy and improvement of the land, whether he claims under the Cherokee warrant, or a pre-emption under the act of 1830. The defendant’s legal title will be considered as founded, exclusively, on the locations made by the floating rights, on which the patents were issued. The two claims set up by the complainant in his bill, require different facts, in the order of time to sustain them : but they are, in no respect, inconsistent with each other. The Cherokee float could be located only on unimproved land, or on land improved by the holder of the warrant. As the land officers at Batesville would not permit the complainant to make an entry under either claim, it is therefore important to ascertain on what ground they decided, and also as to the sufficiency of the evidence to sustain the right as claimed. There can be no question that the decision of these officers was founded on the prior New Madrid locations. These were made before the complainant took possession of the land. This, under the circumstances, being an insuperable objection to the entry, no court can presume that their decision was made on any other ground, unless such ground was stated, or the evidence was defective. The voluminous correspondence of the general land office shows that the land officers considered the above New Madrid locations ap .an appropriation of the land. Was the evidence adduced by the complainant sufficient to establish his right ? The authority to Samuel C. Roane to make the entry, as the agent of Cunningham, under the act of 1824, was undoubted. The application to make the entry was in due form. The Cherokee warrant had been issued by the land officers, who were called upon to make the entry. The assignments upon the warrant were prima facie evidence of right in Cunningham, and there does not appear to have been any objection to them, they must be considered, therefore, as having been held sufficient. The money on the entry was offered to be paid to the Receiver, and the only defect in the evidence was as to the improvements and occupancy by the complainant. These, it is contended, the court may presume, were within the knowledge of the land officers, or that the faets were proved by parol, or that they were proved by affidavits, which have become mislaid or lost. As the proof in the record, in regard to these facts, applies to the pre-emption claimed under the act of 1830, there is no occasion to resort to presumptions on this head. The pre-emption act of the 29th May, 1830, in the first section, provided, “ That every settler or occupant of the public lands, prior to the passage of this act, who is now in possession, and cultivated any part thereof in the year 1829, shall be, and he is hereby, authorized to enter, with the Register of the land .office for the district in which the lands may lie, by legal subdivisions, any number of acres not more than 160 acres, or a quarter section to include his improvement, upon paying to the United States the then minimum price of said lands.” Under this law, the applicant was a witness, and Cunningham was interrogated by the land officers on his application. He stated that, in the year 1829, he cultivated about four acres on the .quarter section claimed, and that he had been in possession of said improvement for near ten years, and that he was still in possession of it. And he further stated, Christian Brumback had an improvement on the same quarter section, which he had in cultivation in the year 1829, and has continued to hold possession of the same to this time. This statement is corroborated by the oath of C. Brumback, and as to the occupancy and improvement of complainant, by C. H. Pelham and Richard Searcy. It is clearly shown that the improvements of Cunningham, up to 1831, were wholly on the quarter section claimed, and that his cultivation and occupancy continued without interruption,¿from the time he took possession in 1821, until the fall of the year 1831. He then removed to his present residence, the principal part of which is on the north-west quarter section, but a part,' if not all, of his out buildings, are on the south-east quarter. His former residence was south of his present one. The improvement he made at first is still cultivated by him. As lot number one, on which the complainant’s first house was built, was conveyed to Bertrand, his step-son, in 1821, by O’Hara, it is contended that the complainant had no such residence on the land, as to entitle him to a pre-emption. Bertrand was a minor, and lived with his step-father at the time, and it is quite clear that a minor cannot claim a pre-emption right. But, in addition to this, as the case is now before us, it does not appear that O’Hara had any right to the lot conveyed. It is objected that Cunningham’s improvements, though on the quarter-section claimed, are limited by the boundaries of a certain square, or lots, within the city of “ Little Rock,” and that, consequently, he cannot claim a pre-emption for the quarter section. On the 20th November, 1821, certain individuals, assuming to be the owners and proprietors of the north-east fractional quarter of section number three, and of fractional section number two, of township number one, north of the base line in range number twelve west, entered into a deed of assurance, in which they agreed to lay out the town of Little Rock, specifying the streets and alleys, and making certain donations of public squares and lots for public purposes. This plat appears to have been surveyed so as to embrace the quarter-section in controversy. In their answers, the defendants specify a number of lots sold in the south-east quarter, and they allege the greater part of it has been sold in lots! The proprietors, in their deed, say that they extended the plat to adjoining lands not owned by them. This survey of lots in the south-east quarter of section three, if made without authority, cannot embarrass the complainant’s right.- .The New Madrid locations being out of the case, should the right of the complainant be sustained against the legal title of the defendants, the surveys must be considered as void-. The town was incorporated in 1825, and, by the act of 1827, the corporation was extended so as to embrace the whole of the town plat. When the improvement of the complainant was commenced, the south-east quarter was in its natural state, unchanged by any improvement. Every legal requisite appears to have been complied with under the act of 1830, to entitle the complainant to a pre-emption. His improvement and occupancy under the law, were clearly proved. Indeed, it would seem, from the facts, that he was entitled to become the purchaser of the land under the law of 1824. But all the facts necessary to establish his right, were before the Register and Receiver on his second application. His application to make the' entry, may be said to have been rejected because it was not allowed. But no doubt can exist as to the ground of the rejection. It was not on account of any deficiency in the proof, but on the ground of the New Madrid locations. This is placed beyond question, by the parol proof in the case, and the correspondence of the general land office. Other objections' to the claim, after the second rejection, were stated by that officer, which alleged a want of diligence by the complainant, in failing to do what he had proved was done, in the prosecution of his right. Some of the objections showed a misapprehension of the facts, others of the law. The offices at Batesville were loosely kept, and it appears, in proof, that some year or two before his death, Boswell, the Register, became intemperate, and his duties were neglected. Great labor was required from his successor to reduce to system the confused mass of papers he found in the office. It was the practice of the office', to endorse on the envelope of the pre-emption papers, the decision of which no other entry was made. And one of the witnesses states that “rejected” was endorsed on the envelope, which inclosed the papers of Cunningham. It is difficult to reconcile this fact with two lists in the' reeord, duly certified, of pre-emptions allowed, in both of which the name of Cunningham is found. The word “rejected” is on one of the lists. There can be no doubt the claim was rejected as often as it was brought to the notice of the land department, so long as the New Madrid locations were sanctioned. No other decision could be made. But on 6th June, 1838, floats were permitted to be located on the quarter section in controversy, covered by the New Madrid locations. This was procured through the agency of the defendants, and for their benefit. It was the result of a controversy of nearly twenty years continuance. Since eighteen hundred and twenty-one, Cunningham had occupied the land, and carried on the controversy with a commendable energy, and at no small expense of time and money. He urged his claim at the general land office, personally, and by agents. The correspondence on the subject was earnest and voluminous. But the defendants having made their entries,received the legal title. And their equity must now be compared with that of the complainants. The New Madrid locations were cohtrolléd by the defendants.' And they were not withdrawn, or the obstacle which they created removed, until the defendant’s entries were made. The floats, under which these entriés were permitted, were issued under the act of 1836, continued in force by the act of 1834.' The second section of the act declared that these floats should bfe so located' “ as not to'interfere with other settlers having a right of preference.” And the circular of the land office directed that they “should be restricted to unimproved and vacant lands.” These stringent regulations were not sufficient to protect the rights of the complainant. His occupancy, improvements, and claim, were known to' the defendants, and to all the officers of the government, who-acted on1 the subject. They excused or justified themselves on the ground that, by permitting the entry to be made, many of the citizens of “Little Rock” would be quieted in their titles. On the 6th July, 1838, an instrument under seal, was entered into between Roswell Beebe, to whom the patents were issued, of the one part, and the mayor and aldermen of the city of “Little Rock,” in behalf of said city, as well as in behalf of the State of Arkansas, and also in behalf of any person or persons who may have, in his own right, a proper and regular chain of conveyances of any town lot or lots situated in the first original town, now city of “Little Rock,” derived from, by or under any one or more of the original owners and proprietors of the town as represented upon the first original plan as then surveyed and laid off into town lots, of the other part, witnesseth: that whereas the said Roswell Beebe has caused to be located and entered with pre-emption floating claims, at the land office at “Little Rock,” and. upon which the city south of the Arkansas river, and west of the Q,uapawline,is nowbuilt, the following described tracts, or parcels of land, to wit: the north-west fractional quarter of fractional section three, and the west fractional part of the north-west and south - west fractional quarters of fractional section two, all in township one north of the base line of range twelve west, die. And in all cases where purchases of lots had been made in the above tracts, Beebe bound himself to release to the purchasers. This arrangement induced the land officers to permit the entries to be made, as well on the south-east quarter in controversy, as on the tracts above described. And it was considered, at the general land office, as a sufficient compliance with the circular of that office, dated the 11th October, 1837. The patents on this view were issued to Beebe; and, on the 11th January, 1842, Beebe conveyed one-half of the south-east quarter in controversy to Ashley. However satisfactory the agreement of Beebe may have been to the claimants of lots on the tracts specified in his agreement, as it did not embrace the land claimed by the complainant, it was not designed for his benefit. And it is unaccountable that the land officers at “Little Rock,” and at Washington, should have considered the arrangement as a compliance with the regulation which prohibited the entry of floats upon improved or occupied land. And it is worthy of remark that these locations were permitted, to be made at Little Rock, while the complainant was at Washington, prosecuting his claim. Has the complainant placed himself in a position to object to the defendant’s equity? He did every thing he could reasonably be required to do, to locate the Cherokee warrant on land, under the act of 1824. Had it been objected on that application, that he did not prove his improvement and occupancy, the witnesses would, at once, have been called. With this exception, he did every thing the law required to perfect his claim. But, under the act of 1830, his proof was, in no respect, defective. It was worthy of the highest credit, and full to every point; and the money was offered to be paid. But the locations of the New Madrid locations were an obstacle then, as they had been on the first application. These locations were not in the way of defendant’s floats, and it is not material to enquire by what means they were set aside. This being done, the rights of the complainant’s were paramount to those acquired under the new location. Those rights were founded on the settlement and improvement in 1821, and on the acts done subsequently in the prosecution of his claim. Having done every thing which was in his power to do, the law required nothing more. And the defendants who caused the floats to be located on the premises, had full notice of the complainant’s rights. They are chargeable with this notice. Under the second section of the act of 29th May, 1830, and the circular of the commissioner of the general land office, of 11th October, 1847, so far as the new entries interfered with the rights of the complainant, they were void. They were in conflict with the law and the regulation. The pretence that the agreement of Beebe, which bound him to execute deeds to the purchasers of lots, was a compliance with the above circular, so far as regards the land in controversy, was without foundation. It may have misled the officers at Washington; and, in this, it may have answered its purpose. The officers of the government are the agents of the law. They can not act beyond its provisions, nor make compromises not sanctioned by it. By the second section of the act of 1830, it is provided, “That if two or more persons be settled upon the same quarter section, the same may be divided between the two first actual settlers, if by a north and south, or east and west line, the settlement or improvement of each can be included in a half-quarter section.” At the time the complainant applied for a pre-emption under the act of 1830, he stated that Christian Brumback had an improvement on the same quarter section, which he had in cultivation in the year 1829, and has continued to hold possession of the same to this time. And it was proved that Brumback culti-yated the land in 1830. The improvement occupied by complainant was commenced about the same time as the one occupied by Brumback; and the evidence shows that they were the first settlers on the land. This, we suppose, under the law, limits the pre-emption claimed by the complainant to one-half the quarter section. The residence and improvement of Brumback brought him prima facie within the law, whether he applied for and attained a pre-emption or not. It was necessary, under the regulations of the general land office, that the complainant should state in his applications the .occupancy, improvement, and cultivation of Brumback, and whatever objection may be made to his' pre-emption claim by the government, cannot enlarge the right of the complainant. Brumback applied for a pre-emption in the quarter section, under the act of 1830, and established his right in every thing, except the tender of the money. His claim .was rejected, no doubt, on the same ground as was that of the .complainant’s. 6 Brumback had conveyed his right to Ashley, in whom the legal title vested to one-half of the quarter section. This removed the objection to the location of one of the floating rights for 80 acres on the quarter, as the improvement, if not made by Ashley, was owned by him. In regard to the one-half of the quartet*, the entry was not prohibited by the second section of the act of 1830, or the circular of 1837. To extend the pre-emption right of the complainant over the entire quarter, would cpver improvements of another individual, made about the same time as those on which his pre-emption is founded. This would disregard the provision of the law, which gives to each settler, where there are two upon the same quarter section, eighty acres. As the right set up by the complainant arises under an act of Congress, and the decision of the Supreme Court of Arkansas was against that right, this court has jurisdiction of the case. We have not considered any right equitable or legal, as arising under the New Madrid locations, laid upon the land in dispute. Such right, if any exist, is not presented in the pleading in such form as to require its consideration and decision. It therefore remains wholly unaffected by the decree. The facts in the case are exceedingly voluminous and complicated ; but we have considered them, and the legal and equifa-' ble bearing they have upon the title of the parties. Upon this view, we are brought to the conclusion that the entries on which the defendant’s patents were issued, were void, so far as they interfere with the claim of the complainant, for the reasons stated, and that, consequently, the patents are also void. The decree of the Supreme Court of Arkansas is therefore reversed, and the cause is remanded to that court, with instructions to enter a decree in pursuance of this opinion. And in order to give more definitely our views, we state : That, on a full consideration of the pleadings, and proof in the case, we consider that the two entries of 80 acres each made in the name of Samuel Plummer and Mary Louisa Imbeau, on the south-east quarter of seption number three, in township one north, and in range twelve, west of the fifth principal meridian, south of the Arkansas river, are void as far as they interfere with the pre-emptive right of Matthew Cunningham, to one-half of the said quarter; and that Roswell Beebe and the heirs of Chester Ashley, deceased, defendants, shall execute a deed of quit claim to the said Cunningham, on his paying or tendering to them the minimum price of the public land, with interest from the 6th June, 1838, the time the above entries were made, to one-half of the above quarter section, by east and west, or north and south lines, so as to include his improvement on the quarter section, or, if such a division cannot be made, that they convey to him, as aforesaid, a joint interest ■of one-half in the quarter section. And, the court order that the decree shall in no respect effect any right which may or does exist, under the New Madrid locations, in the defendants or other persons, if any there be. Proceedings in the Supreme Court of Arkansas, on the mandate of the Supreme Court of the United States. Mr. Justice Walkee delivered the opinion of the Court. By the judgment and decision of the Supreme Court of the United States, at their December term, 1852, the decision and judgment of this court were reversed and set aside, and the case ¡sent back with a mandate to us, for further proceedings to be had in conformity with such opinion. Upon the filing of this mandate, with a copy of the opinion of the United States Court, at the present term, the defendants, Beebe and Mary W. Ashley, came and filed their suggestion, making known to this court that, after the writ of error had been sued out from the decision and judgment of this court, to the Supreme Court of the United States, Frances Ann Ashley, one of the defendants, intermarried with one Andrew F. Freeman, and has ■since, on the — day of October, 1851, departed this life, leaving issue, her surviving, Mary Ashley Freeman, an infant of tender age, her sole heir, who is still alive ; and questioning the right of this court to proceed in the cause until she is made a party to .the suit. To this suggestion, the complainant responds, admitting the 'facts set forth in the suggestion, but insists that the infant Mary Ashley Freeman has no such interest in the estate as requires that she should be made a party to the suit, and filed, as evidence of that fact, a copy of the will of Chester Ashley, under whom she, as his grand daughter, is supposed to claim. Before any decision upon this suggestion was made, the defendants, Mary W. Ashley, Roswell Beebe, William E. and Henry C. Ashley, also filed two pleas, in which the same facts set forth in the suggestion, are averred and insisted upon in bar of any action to be had by this court in obedience to the mandate of the Supreme Court of the United States. The complainant has filed his motion to strike these pleas from the files. Thus two questions are presented: First, The sufficiency of' the pleas: Secondly, The disposition of the case under, the suggestion of the death of Mrs. Freeman and the existence of an heir. As regards these pleas, we find much difficulty in determining to whas class they should properly belong. They deny the obligation of this court to yield obedience to the mandate of a superior court, for an alleged want of jurisdiction of the person of one of the parties in interest at the time the cause was submitted and determined. They, in effect, tender an issue to the inferior court, by which it is called upon to sit in judgment upon the regularity of the proceedings had by the superior court. But, whether considered in bar or abatement, the principle involved is too well settled to admit of doubt. The decision of a superior court is the law of the case to the inferior court to which it is sent for further adjudication; and no matter how irregular, or upon what misapprehension of facts it may have been made, it must be obeyed. Such has been the settled doctrine of this court. In Fortenberry vs. Frazier, (5 Ark. 202,) it was held, “That, after a case had been decided by the Supreme Court, and remanded to the inferior court, and is again brought before the Supreme Court, nothing is before the court for adjudication, but the proceedings subsequent to the mandate. This decision was cited with approbation, in Porter et al. vs. Doe Dem. Hanly et al., (5 Eng. Rep. 190,) and in several subsequent decisions of this court. In the case of Sheller’s Ex. vs. May’s Ex., (6 Cranch R. 266,} where the mandate of the Supreme Court of the United States was returned to the District Court of Kentucky, it was, for the first time, discovered that the circuit court had no jurisdiction whatever of the case. Upon a division of the judges, the case was again sent to the supreme court for its decision, and it tvas held that the circuit court must obey the mandate and proceed with the case. Ex parte Tobias Watkins was a still stronger case. There, it was shown conclusively that the court had no jurisdiction, and yet the supreme court held the judgment so far conclusive that a habeas corpus was refused. 3 Pet. 193. In view of these authorities and upon principle, we do not hesitate to sustain the motion to strike out these pleas. This leaves us to consider the second question — -what disposition shall we make of the suggestion of the death of Mrs. Freeman, and of the existence of an heir who succeeds to her rights? We have said that the mandate of the supreme court of the United States is obligatory upon us. We' mean, by this, that, guided by its interpretation of the law governing the case, and conforming our judgment in all respect to theirs, so far as expressed, we are, nevertheless, in regal’d to the other matters arising upon subsequent proceedings, left free to act under the guidance of our own judgment of the law. So far, then, as the suggestion is intended to affect the judgment of the supreme court of the United States, we have nothing to do with it. But when the ca'se comes back for our further action under the mandate of the supreme court, in all matters not inconsistent with the opinion therein delivered, we are just as free to act as if the case was for the first time before us for consideration. This suggestion then, so far as our further action in and adjudication of the case are concerned, is of this class, and will be considered. From the state of the case, as we understand it, it is not necessary to decide whether the action could have been maintained against Mary W. W. Ashley, in view of her rights under the will, or whether the heirs (children of Chester Ashley) were or not indispensably necessary parties. Because we think the case rests upon a general rule extending alike to all parties defendants. And that we may free the question from any connection with the extent or nature of the interest in the defendants, we will suppose that Chester Ashley had been himself the party defendant, and the suggestion had been made, as it now is, that after the issue formed, and the submission of the case in this court, and after an appeal from its decision to the supreme court of the United States, but before any hearing or submission in that court,the defendant had departed this life, leaving heirs in being at the time. Admitting all this, and putting out of all question the' amount or extent of interest of the heir, we would not suffer this' suggestion to arrest or postpone the action of this court. Our uniform practice in such cases, has been, where such suggestion' is made, to proceed in every respect as though the party was still in life, and to direct the judgment to be entered as of a day after the submission- of the cause, and before the death of such defendant. Such is our every day practice, sustained as well by the practice of other courts as sound reason. In this, there is no infringement of right. Before the submission of a cause, the suitor has a right to plead, to be heard in defence, and to offer evidence to sustain the issue. But' after the case is submitted,he can no longer be heard, and, strictly speaking, it is a contempt of court for him to attempt to be heard in any way. There is then no reason-for bringing him before the court, because his presence is not necessary to a full vindication of his' rights. The court is moreover presumed to be in actual'judgment upon the case from the time it is submitted,- and may in fact have decided- the case before the death of the party, but not formally delivered its decision until after. A whole term, in contemplation of law,- is considered as one day; and, by a legal fiction, it may be said that time between the submission and determination of a cause, is but one day. So that the practice may be said to be settled by long usage in this court, upon the authority of numerous decisions of other courts directly in point, and upon reason and analogy. It is a convenient practice not prejudicial to the rights of any, and greatly facilitating the business of the courts. It may, however, be contended that this rule, though of general application, does not apply in this particular case. It is true that there was a writ of error sued out from the judgment of this’' court to the supreme court of the United States ; that the case has been tried there, the decision of this court reversed, and the cause remanded for further proceedings. But then when a case comes back to this court, and is again docketed here, with our judgment reversed, it stands for trial just as any other case on docket, to be governed by the same rules of law, and under the same practice, only so far as we are required to conform our own opinion to that of the supreme court of the United States. This is unquestionably true, and therefore, so far as this question is concerned, as it is not a point raised before the supreme court, it comes fully within the rule laid down. This suggestion is admitted to be true, and thereby jt appears that Frances Ann Ashley, who intermarried with Andrew F. Freeman, departed this life after the case was submitted for final adjudication in this court. We will direct that the clerk do enter the judgment and decision herein as of a day prior to the death of this defendant and subsequent to the submission of the cause. Having disposed of these preliminary points, we have but little to do, so far as regards the merits of the controversy and the proper decree to be rendered, but to announce the conclusions and directions of the supreme court, whose decision and direction, so far as they extend, must be our guide. In view of all which, and the facts and law arising thereon, we are of opinion (and it is in the language of the supreme court) that the two entries of 80 acres each, made in the name of Samuel Plummer and Mary Louisa Imbeau, on the south-east quarter of section three, in township one north, and in range twelve, west of the 5th principal meridian, south of the Arkansas river, are void, so far as they interfere with the pre-emption right of Matthew Cunningham to one-half of said quarter; and that Roswell B.eebe and the heirs of Chester Ashley, deceased, defendants, shall execute a deed of quit claim to the said Cunningham, on his paying or tendering to them the minimum price of the public land, with interest from the-6th June, 1838, the time the above entries were made, to one-half of the above quarter section by east and west, or north and south lines, so as to include his improvement on the quarter section, such decision, if practicable, to be made according to the usual legal subdivisions by which the United States divide lands granted by 80 acre grants to pre-emptioners, or if such division cannot be made, that they convey to him as aforesaid a joint interest of one-half in said quarter section. And because the circuit court refused to decree in behalf of the complainants, there is error for which the judgment and decree of said court must be reversed and set aside with costs, and the case remanded with instructions to that court to proceed by commissions, or otherwise, according to the practice of the court, to ascertain the locality of the said improvement of said complainant, and the practicability of dividing the said quarter section to one-half of which he is entitled as a pre-emptioner, as herein above decided and adjudged, and to hear and determine the case according to law and not inconsistent with the opinion herein delivered. Watkins, 0 J., not sitting.